UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS LACEY,

        Plaintiff,                        Case No. 17-10834
vs.                                                   HON. MARK A. GOLDSMITH

BEN CARSON,

        Defendant.
_____/

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 29)

This matter is before the Court on Defendant Ben Carson's motion for summary judgment (Dkt. 29).[1] Plaintiff Thomas Lacey worked for the United States Department of Housing and Urban Development ("HUD") for twenty-four years, becoming the highest-ranked HUD official in Michigan from 2009 to 2010. Lacey alleges that after more than twenty years of employment, he was terminated because of his age to promote younger employees within HUD. After Lacey voluntarily dismissed certain counts (Dkt. 28), the claims remaining in the case are: age discrimination under the Age Discrimination in Employment Act ("ADEA") (Count Two), retaliation under Title VII and the ADEA (Count Three), and hostile work environment under the ADEA (Count Six). See Am. Comp. (Dkt. 7). For the following reasons, the Court grants Defendant's motion for summary judgment.

---

[1] Ben Carson is being sued in his official capacity as the United States Secretary of Housing and Urban Development to obtain both injunctive relief and money damages. First Am. Compl. at 14 (Prayer for Relief) (Dkt. 7). Carson does not address whether all of the relief sought in this case is appropriate against him in his official capacity.

1

# I. BACKGROUND

Lacey began working for HUD on October 27, 1987. Lacy Dep. at 7:20-23, Ex. 1 to Def. Mot. (Dkt. 29-2). In April of 1998, he was promoted to the Division Director for the Detroit field office, which is commonly referred to as the Detroit Hub. Id. at 6:8-10. The Director of the Detroit Hub is the highest position within HUD in the State of Michigan. Id. at 6:11-7:12. Under the Director and Division Director are Public Housing Revitalization Specialists ("PHRS"), who support local Public Housing Authorities ("PHA"). Id. at 12:9-18. There are approximately 132 PHAs in Michigan that assist residents in achieving affordable housing. Id. at 8:20-9:4, 12:5-8.

Prior to 2009, Lacey had never had an employee evaluation rating him as anything less than fully successful, id. at 49:2-5, and received Employee of the Year twice, most recently in 2008, id. at 86:3-20. However, everything changed in February 2009 when the Detroit Hub Director was removed from his position and the regional director, Unabyrd Lei Wadhams, appointed Lacey as the Acting Director. Id. at 41:11-18.

As the Acting Director, it was Lacey's duty to assist the PHAs with HUD's mission of providing affordable housing to Michigan residents. Id. at 40:18-24. Lacey describes his duties as the Director as

> [m]onitoring, supervising staff to accomplish [HUD's] goal. And in addition to those duties, I was also tasked with doing all the duties of the Division Director, which is fielding complaints, conflict resolution, assisting PHAs with complaints, congressionals [sic], public housing city, state, local officials, still working with all those entities, as well as a director you have to work directly with headquarters' staff because they would have specific tasks for the director on mostly a local basis for the Secretary of HUD.

Id. at 41:1-10.

Lacey did not have much interaction with Wadhams in the beginning of his time as Acting Director. Lacey Decl. ¶ 1, Ex. 6 to Pl. Resp. (Dkt. 31-7). He had one or two phone conversations

2

with her and he says that the calls were always calm and professional. Id. However, in May 2009, without explanation, Wadhams asked Lacey (age 56) if he would voluntarily give up his position as a GS-14 to allow Doug Gordon (age 38) to be promoted to GS-14 and take over the Acting Director position. Lacey Dep. at 99:22-101:13; DOB Documents, Ex. 1 to Pl. Resp (Dkt. 31-2).[2] In HUD, each office was allowed only one GS-15 and two GS-14s. Id. at 100:5-8. Lacey declined to voluntarily relinquish his GS-14 pay grade, in part, because he would be demoted to a GS-13, and he was not sure if he would be able to work his way back up to GS-14 before he retired. Id. at 100:10-25. According to Lacey, Wadhams did not take his refusal to relinquish his position well. Id. at 100:24.

Wadhams promoted Gordon to Acting Director notwithstanding Lacey's refusal to have his pay grade lowered. Id. at 101:25-102:18. Gordon's promotion lasted a week or two before Wadhams reversed the decision. Id. Lacey believes that someone in HUD Human Resources informed Wadhams that the role reversal was not appropriate. Id. at 102:19-20. Wadhams then proposed that Gordon and Lacey both manage the Detroit Hub as Co-Division Directors, leaving the Director spot vacant. Id. at 102:22-24. However, it does not appear that the Co-Division Director strategy ever went into effect.

On July 13, 2009, Wadhams sent Lacey an email asking the status of a number of PHA audits. 7/13/2009 Email regarding OIG audits, Ex. 3 to Def. Mot. (Dkt. 29-4). The Office of the Inspector General ("OIG") periodically audits PHAs to determine compliance with HUD regulations. An OIG audit may make negative findings against a PHA, and field offices are tasked with bringing the PHA back into compliance. See Lacey Dep. at 53:19-54:8. Lacey's response did not satisfy Wadhams, who expressed dissatisfaction with both Lacey and Gordon on the status

---

[2] "GS" refers to the General Scale, which is the pay scale used by the United States for civil service employees. The General Scale begins at GS-1 and goes up to GS-15.

of the OIG audits. See 7/13/2009 Email regarding OIG audits. A few days later, after review of Lacey's monthly reports, Wadhams sent another email noting that the "Detroit office has the largest number of troubled [PHAs] in comparison to other field offices of similar size." 7/17/2009 Email regarding troubled PHAs, Ex. 4 to Def. Mot. (Dkt. 29-5).

Wadhams decided to make a personal visit to the Detroit Hub during the week of July 28, 2009. After the office visit, she sent the following email to Lacy on August 10, 2009:

> As shared with you during the visit, I found a general lack of internal management and programmatic controls as well as limited and inconsistent oversight of all housing commissions, troubled agencies, IPA and OIG audits. The office has the greatest number of troubled housing agencies in my portfolio with little or no documented follow-up on MOAs. There are also serious conduct and performance issues. I am working on a partnership arrangement with two Hub Directors . . . to assist with the identification of solutions, program training, development of standard operating protocols & logs, and mentoring for you and Doug, during this interim period. I remain fully engaged in these efforts and will assist with the development and implementation of the office's corrective action plan and training needs assessment and schedule.
>
> I have also reiterated with you my expectation for acceptable performance as noted in your performance standards.

8/10/2009 Email regarding Office Review, Ex. 6 to Def. Mot. (Dkt. 29-7). The subsequent written review was critical of the Detroit Hub and the leadership specifically. See Wadhams' Office Review Report, Ex. 7 to Def. Mot. (Dkt. 29-8). Lacey concedes that the Detroit Hub was "struggling to carry-out [sic] monitoring and oversight responsibilities in an efficient and effective manner" and that the primary office weaknesses were "inadequate workload management, sporadically applied internal controls, and poor personnel management." Exec. Summ., Ex. 8 to Def. Mot. (Dkt. 29-9); Def. Mot., Undisputed Facts ¶ 21; Pl. Sur-reply at 1 (Dkt. 38).

Wadhams frequently called Lacey and spoke to him in hostile and demeaning ways and threatened demotion or disciplinary actions. Lacey Dep. at 96:5-22, 107:1-14. On September 14, 2009, Wadhams sent a memorandum to Lacey regarding "Performance concerns and Potential

4

Impact on Performance Rating." 9/14/2009 Memo regarding Performance, Ex. 9 to Def. Mot. (Dkt. 29-10). Despite her performance expectations set for Lacey in May 2009, she continued to express concerns with Lacey's capacity to manage the Detroit Hub. Id. She detailed her concerns with his persistent timeliness issues with complying with various reporting requirements, overdue OIG audits, and in some cases missing HUD records. Id. Wadhams directed Lacey to draft a Performance Improvement Plan ("PIP") by September 28, 2009 addressing the noted deficiencies and actions to be taken to address the deficiencies. Id.

Three days later, on September 17, 2009, Lacey sent an email to Deputy Assistant Secretary Deborah Hernandez seeking to be transferred away from Wadhams' abusive and harassing behavior, which he believed was motivated by racial animus. 9/17/2009 Email regarding Harassment, Ex. 10 to Def. Mot. at 2 (Dkt. 29-11). On October 1, 2009, Lacey made an informal charge of discrimination based on race to the Equal Employment Opportunity Commission ("EEOC"). Informal Compl. of Discrim., Ex. 10 to Pl. Resp. (Dkt. 31-11); Def. Mot., Undisputed Facts ¶ 26; EEOC Counselor Summ., Ex. 12 to Pl. Resp. (Dkt. 31-13); Wadhams Dep. at 73:3-17. Although somewhat difficult to read, there appears to be a passing reference to age in the informal complaint. Informal Compl. of Discrim. at 2 ("My supervisor has created an unbearable work environment based on discrimination and preferential treatment for race & age."). However, the EEOC counselor makes no mention of age in her summary and notes that she was unable to contact Lacey for additional information. EEOC Counselor Summ. at 1. The EEOC contacted Wadhams notifying her of the complaint, but did not provide her with any documentation. Wadhams Dep. at 73:3-17. On October 23, 2009, Wadhams gave Lacey a performance review of "fully [successful]," which she testified was not warranted, but that she wanted to give him a "clean slate." Id. at 58:3-10.

Lacey remained the Acting Director until February 2010, when he was replaced as Acting Director by Lucia Clausen from Minnesota. Lacey Dep. at 43:18-23. Lacey returned to his position as the Division Director under Clausen. Id. at 43:24-44:1.

On June 9, 2010, Clausen sent a memorandum to Wadhams concerning Lacey's performance. Clausen Memo regarding Performance, Ex. 18 to Def. Mot. (Dkt. 29-17). In the memorandum, Clausen said the following:

> As you are aware, I have been tasked as the direct supervisor of Division Director, Tom Lacey, Detroit field office, since my arrival as the Acting Director February 16, 2010. It has come increasingly apparent during my time directing this office and Tom, that he is an ineffective management team member. Tom is not performing as an effective Division Director.
>
> In preparing his mid year performance evaluation I am rating Tom as fully successful in two areas, minimally successful in three areas, and unsatisfactory in one area. I find this level of performance to be unacceptable for a GS 14 seasoned employee, a Division Director, and a detriment to the turn around of the Detroit [Hub].

Id. at 1. Clausen's five areas of deficient performance included breaching employee confidentiality. Id. at 2. She recommended that Lacey be reprimanded for the breach of staff confidentiality and placed on a PIP related to his management effectiveness. Id. Clausen's performance review reflected the same concerns raised in the memorandum to Wadhams. June 2010 Performance Rating, Ex. 19 to Def. Mot. (Dkt. 29-20).

In September 2010, Lacey was put on a PIP and received a Notice of Opportunity to Improve ("OIP") by Clausen. PIP and OIP, Ex. 20 to Def. Mot. (Dkt. 29-21). Lacey also received a five-day suspension by Wadhams during the same period. Notice of five-day suspension, Ex. 21 to Def. Mot. (Dkt. 29-22).

Willie H. Garrett was eventually hired as the full-time Director of the Detroit Hub in either August or September of 2010. Lacey Dep. at 44:2-6. According to Lacey, Garrett immediately

began complaining about his performance. Id. at 164:11-25. Garrett extended the PIP and OIP to January 21, 2011 to give Lacey a chance to improve. Id. at 165:11-14; see also April 2011 Performance Review at 2, Ex. 28 to Def. Mot. (Dkt. 29-29). However, Lacey says that there was no room to improve where he was given conflicting assignments and criticized for relatively minor mistakes. Id. at 166:2-17.

On December 3, 2010, Garrett sent Lacey a memorandum addressing delinquent reports, reviews, memorandums of agreements, corrective action plans, and audits. Direct Report, Ex. 26 to Def. Mot. (Dkt. 29-27). Garret detailed each of his concerns and set out his expectations for Lacey's improvement and notified him that failure to meet those expectations may result in removal. Id. at 3. Although Lacey admits that he made minor mistakes and had some timeliness issues, he says that most of the behavior for which he was being disciplined was fabricated. Lacey Dep. at 166:15-17; 168:10-169:9; 174:6-9; 176:6-9.

On April 8, 2011, Garrett suspended Lacey for fourteen days. Notice of fourteen-day suspension, Ex. 27 to Def. Mot. (Dkt. 29-28). Lacey's April 2011 performance review showed four areas rated as "unsatisfactory" and one area of "minimally satisfactory." April 2011 Performance Review at 1. On November 7, 2011, Wadhams terminated Lacey's employment. Notice of Removal, Ex. 29 to Def. Mot. (Dkt. 29-30). It appears that Gordon was promoted to the Director position in 2015. See FY16 Performance Review, Ex. 13 to Pl. Resp. (Dkt. 31-14).

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the

7

governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III. ANALYSIS

### A. Age Discrimination under the ADEA (Count Two)

Lacey alleges age discrimination under the ADEA, 29 U.S.C. § 621 et seq., which prohibits employers from discriminating against covered employees on the basis of age:

> It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). "To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" Scheick v. Tecumseh Pub. Sch., 766 F.3d 523, 529 (6th Cir. 2014) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 169 (2009)). "The direct evidence and circumstantial evidence paths are mutually exclusive; the plaintiff can meet h[is] burden with either method of proof." Weberg v. Franks, 229 F.3d 514, 523 (6th Cir. 2000).

8

Lacey concedes that there is no direct evidence of age discrimination. Lacey Dep. at 188:21-189:14. Therefore, Lacey must rely on circumstantial evidence. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 584 (6th Cir. 2003) (quoting Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986)).

"Gross clarified that the burden of persuasion does not shift to the employer in an ADEA case, 'even when a plaintiff has produced some evidence that age was one motivating factor in that decision.'" Scheick, 766 F.3d at 529 (quoting Gross, 557 U.S. at 180). Nonetheless, the Sixth Circuit and "every other circuit has held, application of the McDonnell Douglas evidentiary framework to prove ADEA claims based on circumstantial evidence remains consistent with Gross." Id.

Under the three-step McDonnell Douglas framework, the first step requires the plaintiff to establish a prima facie case of age discrimination. Allen v. Highlands Hosp. Corp., 545 F.3d 387, 394 (6th Cir. 2008). The second step requires the employer to articulate legitimate nondiscriminatory reasons for the adverse employment action. Id. (citing Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998)). And, if the employer meets its burden, the third step requires the plaintiff to show that the employer's nondiscriminatory reasons were pretext for age discrimination. Id. Lacey's discrimination claim fails at the first step, because he has not established a prima facie case of age discrimination.

To establish a prima facie case of age discrimination, Lacey must show that "(1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 521 (6th Cir. 2008).

Defendant does not dispute that Lacey was at least forty years old at the time of the alleged discrimination or that Lacey was qualified for his position as Division Director. There is some dispute as to whether Lacey was subject to any adverse actions outside of his termination, and Defendant disputes that Lacey was replaced by a younger worker.

Lacey's response brief is not a model of clarity. It appears that Lacey is arguing that he suffered adverse actions when Wadhams promoted Gordon to the Acting Director position, changed his employment duties, subjected him to progressive discipline, and eventually terminated his employment. The Sixth Circuit adopted the following standard with regard to adverse employment actions:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Hollins v. Atl. Co., 188 F.3d 652, 662 (6th Cir. 1999) (alteration in original) (quoting Crady v. Liberty Nat. Bank & Tr. Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). "The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

Lacey suffered a de minimis employment action when Gordon was promoted to "Acting" Director of the Detroit Hub for a one-to-two-week period. The very nature of an acting director position is impermanent. Lacey was asked to serve as the Acting Director until a suitable replacement was found. But even if the acting director position was more than a short-term position, Lacey was only removed from the position for a brief period, which the Sixth Circuit has held is insufficient to constitute a materially adverse employment action. See Bowman, 220 F.3d at 459-460, 462 (finding that the plaintiff's removal from a Coordinator position for a period of

10

ten days was not a materially adverse employment action). Furthermore, there is no indication that Lacey's salary was diminished during that time. Lacey's temporary removal from the acting direct position is not a materially adverse employment action.

Although his temporary demotion was not an adverse employment action, there is no question that Lacey's termination was a materially adverse employment action. Additionally, there is a dispute as to whether his change in responsibilities and the progressive discipline were materially adverse employment actions. Therefore, Lacey has satisfied the adverse employment action element of his prima facie case.

However, Lacey has failed to establish that he was replaced by a younger worker. Lacey served as Acting Director until Clausen replaced him in February 2010, and Garrett was ultimately hired as the Director in August 2010. Even assuming Clausen and Garrett replaced Lacey in some fashion, nothing in the record establishes their respective ages. As for Gordon, who became Director of the Detroit Hub in 2015, he did not replace Lacey; and even if Gordon replaced Lacey in 2015, he was over the age of 40 at that time. Therefore, Lacey has not established a prima facie case of age discrimination.

### B. Retaliation under Title VII and the ADEA (Count Three)

Defendant argues that Wadhams, Clausen, and Garrett were unaware of Lacey's September 2009 email requesting an accommodation when he was suspended and ultimately terminated. Def. Mot. at 14. In response, Lacey block quotes a retaliation legal standard and then makes the following conclusory arguments:

> 1. Here the Plaintiff has demonstrated that he engaged in protected activity when he complained about discrimination in the September 17, 2009 email to his 3rd level supervisor, Deborah Hernandez.
> 2. The Plaintiff also engaged in protected activity when he filed an EEO Complaint on September 28, 2009.

3. The Plaintiff demonstrated that Wadhams was aware the Plaintiff filed an EEO complaint against her on or before October 28, 2009.

Pl. Resp. at 21 (Dkt. 31).

To establish a retaliation claim, a plaintiff must show that "(1) []he engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse action." Blizzard v. Marion Tech. Coll., 698 F.3d 275, 288 (6th Cir. 2012) (citation and some mark omitted); see also Fox v. Eagle Distrib. Co., 510 F.3d 587, 591 (6th Cir. 2007). "As with age discrimination claims, once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to 'offer a non-discriminatory reason for the adverse employment action.'" Blizzard, 698 F.3d at 288 (quoting Ladd v. Grand Trunk W. R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2009)). "If the defendant meets its burden, the plaintiff then has the burden to 'demonstrate that the proffered reason was mere pretext.'" Id. (quoting Ladd, 552 F.3d at 502). Lacey again cannot meet the first step of the burden-shifting framework, the prima facie case.

Defendant does not dispute that Lacey engaged in protected activity or suffered an adverse employment action. However, as Defendant correctly points out, neither Clausen nor Garrett were in the Detroit Hub in 2009 and there is nothing in the record suggesting that either of them knew of Lacey's September and October 2009 emails and EEOC complaints. Therefore, a retaliation claim cannot be sustained against Clausen or Garrett based on events of which they were not aware and were not in a position to become aware of when they occurred.

There is also no evidence that Wadhams knew about the 2009 email to Deborah Hernandez, but she admits that she knew about the EEOC complaint. The fatal flaw in Lacey's prima facie case, however, is that there is no evidence of a causal connection between his protected activity

12

and any adverse action taken by Wadhams. Taking the facts in the light most favorable to Lacey, Wadhams began aggressively micromanaging him beginning in May of 2009. Lacey's September and October 2009 complaints, if anything, had a positive effect on Lacey's employment. Wadhams gave him a positive performance review, even though she felt it was unwarranted, in order to start with a "clean slate." Wadhams' alleged abusive treatment resumed near the end of 2009, but the record does not reflect that it was any greater than it had been prior to Lacey's complaints. If anything, Wadhams' interaction with Lacey lessened when Clausen and later Garrett became Lacey's direct supervisors.

Additionally, Lacey dismissed his discrimination claims based on race (Count I) and sex (Count V), which were brought under Title VII, and there is no mention of any age-based animus by his supervisors in the record other than a passing reference in Lacey's Informal Complaint of Discrimination. The only circumstantial evidence of any potential age-based discrimination is that Gordon was thirty-eight years old when he temporarily replaced Lacey as the Acting Director. But that stand-alone fact is simply too remote to any adverse actions taken against Lacey to allow a jury to infer retaliation based on age.

Temporal proximity of the protected activity to the adverse employment action sometimes can satisfy the standard at the summary judgment stage. But the proximity of one to the other must be "very close in time." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id. (citing Little v. BP Exploration & Oil Co., 265 F.3d 357, 365 (6th Cir. 2001)). Lacey's protected activities in 2009 and any adverse employment action against him in 2010 and 2011 were not very close in time and Lacey has

13

pointed to no other protected activity in the record from which a jury could infer retaliation. Accordingly, Lacey has failed to establish a claim for retaliation.

### C. Hostile work environment under the ADEA

To establish a prima facie case of hostile work environment based on age, a plaintiff must show that "(1) he was 40 years or older at the time of the alleged harassment; (2) he was subjected to harassment, either through words or actions, based on his age; (3) the harassment unreasonably interfered with his work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) there is some basis for liability on the part of the employer." Brown v. Metro. Gov't of Nashville & Davidson Cty., 722 F. App'x 520, 525 (6th Cir. 2018) (citing Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834-835 (6th Cir. 1996)). "[I]n order for harassment to be actionable, 'it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" Crawford, 96 F.3d at 835 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).

The Sixth Circuit has made clear that "[c]onversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress." Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998). Even an overwhelming barrage of criticism, as Lacey says occurred in this case, "does not rise to the level of severity or frequency required to sustain a hostile work environment claim." Hale v. ABF Freight Sys., Inc., 503 F. App'x 323, 338 (6th Cir. 2012). "While such criticisms certainly may have been frustrating and discouraging, they were part of 'the ordinary tribulations of the workplace' that do not amount to the sort of 'extreme' conduct required to effect a 'change in the terms and conditions of employment.'" Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

The ADEA, like Title VII, "does not set forth a general civility code for the American workplace." See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). Lacey has described a difficult and even harsh work environment. However, he has not demonstrated that his treatment in the workplace was of such an extreme character as to change the terms and conditions of his employment. More important, he has not established that he was treated poorly <u>because of</u> his age in violation of the ADEA. Because Lacey has not shown that he was subjected to severe and pervasive discrimination based on his age, his hostile work environment claim must be dismissed.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (Dkt. 29) is **GRANTED**.

SO ORDERED.

Dated: March 13, 2019　　　　　　　　　　　s/Mark A. Goldsmith
　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　United States District Judge